IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

ISHAM PAUL o/b/o M.P.,              )
                                   )
            Plaintiff,             )
                                   )
      v.                           )      CIVIL ACTION NO. 1:09cv1164-SRW
                                   )
MICHAEL ASTRUE,                    )
Commissioner of Social Security,   )
                                   )
            Defendant.             )

**MEMORANDUM OF OPINION**

Isham Paul o/b/o M.P.[1] brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying her son's application for Supplemental Security Income under

the Social Security Act. The parties have consented to entry of final judgment by the

Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs

submitted by the parties, the court concludes that the decision of the Commissioner is due

to be affirmed.

**STANDARD OF REVIEW**

The court's review of the Commissioner's decision is narrowly circumscribed. The

court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

Rather, the court examines the administrative decision and scrutinizes the record as a whole

---

[1] The court refers to M.P. as the "plaintiff" in this memorandum of opinion.

to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). Factual findings that are supported by substantial evidence must be upheld by the court.  See Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence.").  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

### Child Disability

"Federal regulations set forth the process by which the SSA determines if a child is disabled and thereby eligible for disability benefits."  Shinn ex rel. Shinn v. Commissioner of Social Sec., 391 F.3d 1276, 1278 (11th Cir. 2004) (citing 42 U.S.C. § 1382c(a)(3)(C)(I) and 20 C.F.R. § 416.906).  "The process begins with the ALJ determining whether the child

2

is 'doing substantial gainful activity,' in which case she is considered 'not disabled' and is ineligible for benefits." Id. (citing 20 C.F.R. §§ 416.924(a), (b)). "The next step is for the ALJ to consider the child's 'physical or mental impairment(s)' to determine if she has 'an impairment or combination of impairments that is severe.'" Id. (citing 42 U.S.C. §§ 416.924(a), (c)). "For an applicant with a severe impairment, the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child." Shinn, 391 F.3d at 1278  (citing 20 C.F.R. §§ 416.911(b), 416.924(d).)  This determination is made according to objective criteria set forth in the Code of Federal Regulations (C.F.R.).  As the Eleventh Circuit has explained,

> [t]he C.F.R. contains a Listing of Impairments ["the Listings", found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ("impairment") from which a person can suffer, sorted into general categories. See id. § 416.925(a). For each impairment, the Listings discuss various limitations on a person's abilities that impairment may impose. Limitations appearing in these listings are considered "marked and severe." Id. ("The Listing of Impairments describes ... impairments for a child that cause[ ] marked and severe functional limitations.").
>
> A child's impairment is recognized as causing "marked and severe functional limitations" if those limitations "meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings." Id. § 416.911(b)(1); see also §§ 416.902, 416.924(a). A child's limitations "meet" the limitations in the Listings if the child actually suffers from the limitations specified in the Listings for that child's severe impairment. A child's limitations "medically equal" the limitations in the Listings if the child's limitations "are at least of equal medical significance to those of a listed impairment." Id. § 416.926(a)(2).

Id. at 1278-79. "Finally, even if the limitations resulting from a child's particular impairment[s] are not comparable to those specified in the Listings, the ALJ can still

conclude that those limitations are 'functionally equivalent' to those in the Listings.  In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities. The C.F.R. specifies six major domains of life:

> (i) Acquiring and using information;
>
> (ii) Attending and completing tasks;
>
> (iii) Interacting and relating with others;
>
> (iv) Moving about and manipulating objects;
>
> (v) Caring for [one]self; and
>
> (vi) Health and physical well-being."

Shinn, 391 F.3d at 1279 (citing 20 C.F.R. § 416.926a(b)(1)). "The C.F.R. contains various 'benchmarks' that children should have achieved by certain ages in each of these life domains." Id. (citing 20 C.F.R. §§ 416.926a(g)-(l)). "A child's impairment is 'of listing-level severity,' and so 'functionally equals the listings,' if as a result of the limitations stemming from that impairment the child has 'marked' limitations in two of the domains [above], or an 'extreme' limitation in one domain." Id. (citing 20 C.F.R. § 416.926a(d) and § 416.925(a)).[2]

---

[2] " 'A 'marked' limitation is defined as a limitation that 'interferes seriously with [the] ability to independently initiate, sustain, or complete activities,' and is 'more than moderate.'" Henry v. Barnhart, 156 Fed.Appx. 171, 174 (11th Cir. 2005)(unpublished)(citing 20 C.F.R § 416.926a(e)(2)(I)). "An 'extreme' limitation is reserved for the 'worst limitations' and is defined as a limitation that 'interferes very seriously with [the] ability to independently initiate, sustain, or complete activities,' but 'does not necessarily mean a total lack or loss of ability to function.'" Id. (citing 20 C.F.R. §

# BACKGROUND

## Treatment for Physical Complaints

Plaintiff was born on October 14, 2004. (R. 91). On June 1, 2005, when plaintiff was several months old, Dr. James McQueen of Southeastern ENT evaluated him at the request of a Dr. Wooley, due to plaintiff's difficulty over the previous few months with ear infections. Dr. McQueen diagnosed plaintiff with otitis media with effusion and recurrent otitis media. He recommended tube placement and scheduled plaintiff for a bilateral myringectomy tube placement on June 10, 2005. (R. 141). Dr. McQueen performed the surgery as scheduled on June 10, 2005. (R. 140). Plaintiff returned to Dr. McQueen two weeks later for his first post-operative visit. The doctor wrote that he had "done well." (R. 139). Robin Wilkes, an audiologist in Dr. McQueen's practice, performed a hearing test that day, finding the results to be "normal" for the patient's age. (R. 142).

Plaintiff returned to Dr. McQueen on July 26, 2005. His mother stated that plaintiff was seen in the emergency room and "there was a concern that his tube might have fallen out." Dr. McQueen "was able to reassure her that the tubes are in position and are functioning normally." (R. 138). Five and a half months later, on February 8, 2006, the mother brought him back to see Dr. McQueen, again reporting that an ER doctor "said that he could not see the tubes." (R. 137). Dr. McQueen wrote, "On the right side I can see down to the tube and it is open, patent with no signs of drainage. On the left side the tube is in

---

416.926a(e)(3)(I)).

place and there is a little bit of otorrhea." (R. 137). He diagnosed "[l]eft otorrhea" and prescribed ear drops. He noted that he saw no problem other than the otorrhea and advised plaintiff's mother to follow up with plaintiff's pediatrician. (Id.).

On March 7, 2006, when he was sixteen months old, plaintiff's mother took him to the emergency room at Children's Hospital in Birmingham with a complaint of ear pain. The ER physician diagnosed otalgia and otitis media, and prescribed Amoxil and Citrodex ear drops. (R. 335-337, 342). The following week, because of plaintiff's history of four occurrences of right otitis media in the previous six months, he was evaluated by Dr. William Shirley of the Children's Health Systems ENT Clinic. Dr. Shirley observed a patent tube in plaintiff's left ear and, in his right ear, normal middle ear function and an occluded or extruded tube (R. 331-32). The week after plaintiff's visit to Dr. Shirley, his mother again took him to the emergency room at Children's Hospital in Birmingham due to his ear pain. (R. 327). The physician noted that both ears were within normal limits, with "PE in place" in both ears, with a blood clot in the right ear. He diagnosed URI and teething. (R. 328-29). A few days later, on March 23, 2006, plaintiff returned to the emergency room, running a fever of 102.8. On examination, the doctor again noted tubes with clots. Plaintiff was discharged with a prescription for Motrin and a recommendation to encourage liquids. (R. 169-70, 317-22). The diagnosis was fever and upper respiratory infection. (R. 315).

On March 28, 2006, after finding extruded tubes and hypertrophied adenoids, Dr. Shirley admitted plaintiff for day surgery and performed bilateral adenoidectomy and

bilateral placement of myringotomy tubes.  (R. 144-49, 283-314).  The pre and post operative diagnosis was chronic otitis media.  (R. 289).  On March 31, 2006, plaintiff's mother took him to the emergency room complaining of plaintiff's decreased oral intake after the adenoidectomy.  He was given oral rehydration therapy by means of Gatorade and a popsicle. (R. 164-165, 274-81).  Plaintiff returned to the Children's Hospital Emergency Room on May 12, 2006, with a chief complaint of fever.  The triage nurse recorded a rectal temperature of 99.6.  Plaintiff left the emergency room without being seen by a doctor.  (R. 160-161, 270-73).  Plaintiff returned to the ENT Clinic at Children's Hospital on May 19, 2006 for follow-up after the surgery.  Nurse Practitioner Duncan examined him and noted that he had no change or problem since surgery; she further noted "Audio: [Normal Limits] pre-op."  (R. 150, 266-69).

Plaintiff returned to the Children's Hospital emergency room on June 3, 2006 with a complaint of pain and swelling of an area on his right lower leg.  He was diagnosed with impetigo.  (R. 258-264).

On August 29, 2006, Dr. Adams of Southeastern Pediatric Associates conducted his initial evaluation of the plaintiff, who was then 22 ½ months old.  Under "History," Dr. Adams wrote, "He has had frequent ear infections but otherwise, been a healthy young man." Plaintiff's examination was essentially normal except that the doctor observed "tinea capitis . . . and some associated posterior cervical lymph nodes."  Dr. Adams diagnosed tinea capitis

and prescribed Gris Peg, 250 mg.  (R. 183).[3]

Two days later, plaintiff's mother called the doctor's office stating that plaintiff had "awakened in the night with a welpy rash all over." She thought it might be an allergic reaction to the medication he had been prescribed.  She had given him Benadryl without any improvement.  (R. 183).  Plaintiff was evaluated by Dr. Head. In the physical examination, Dr. Head noted, "He is well appearing, playful, quiet, [and] cooperative." Dr. Head described the plaintiff's rash as a classic urticarial rash.  He prescribed Zyrtec, Atarax for the itching and Nizoral shampoo. (R. 184).

On September 13, 2006, plaintiff's mother brought him back to Dr. Head, complaining of a fever lasting for a day, runny nose and a cough.  She reported that a family member was at home with the flu.  Dr. Head prescribed Tamiflu and Bactrim. (R. 185).  On physical exam, he noted a skin lesion on plaintiff's shoulder.  He diagnosed impetigo and flu exposure. (R. 185).

On September 18, 2006, when plaintiff was just over 23 months old, his grandmother brought him to the office requesting a referral to "childrens rehab for concerns about hearing." (R. 186).  Dr. Ashley examined plaintiff.  The physical examination was normal; Dr. Ashley noted, on examination of plaintiff's ears that both tympanic membranes were "normal," and both tubes were "in place." (Id.). The doctor recommended that plaintiff return at "3 years old" for evaluation and advised plaintiff's grandmother to call if there were problems.

---

[3]  Tinea capitis, also referred to as "ringworm," is a fungal infection of the scalp and hair shaft.  See http://www.mayoclinic.com/health/ringworm/DS00892 (accessed June 10, 2011).

(R. 186).

On October 16, 2006, Dr. Williams diagnosed plaintiff with acute bronchitis and prescribed Atuss DR and Azithromycin. (R. 187). Dr. Williams observed normal tympanic membranes. (Id.). Dr. Williams referred plaintiff to Dr. Warren Rollins, an ENT specialist, who evaluated the plaintiff on November 20, 2006. Dr. Rollins noted plaintiff's history of tube placement by Dr. McQueen in Enterprise and, later, in Birmingham. On examination of plaintiff's ears, Dr. Rollins noted, "Right tympanostomy tube is in place and is functional. The ME space is clear. The left tube is partially rejected with a clear ME space." Dr. Rollins' impression was "[d]oing well post-tympanostomy." He recommended that plaintiff return in three months. (R. 191).

On November 24, 2006, when he was just over two years old, plaintiff was treated at the emergency room of Flowers Hospital in Dothan, after he was found on a bed, with his cousin, chewing on Geodon and Thorazine tablets. He was asymptomatic, with a normal physical exam, and his electrocardiogram was also normal. The hospital administered charcoal on the recommendation of Poison Control and admitted plaintiff overnight for observation, with plans to discharge him in 12 to 24 hours if there were no abnormalities. Dr. Head reviewed plaintiff's testing results and discharged him the following day. (R. 171-73).

On February 7, 2007, plaintiff returned to Dr. Head for a well child checkup. In the "history" section of his notes, Dr. Head wrote, "Discussed Hearing Problem, which is unchanged. (R. 188). However, on physical examination, Dr. Head noted, "Ears normal[,]"

9

and he did not diagnose a hearing problem. (R. 189). Plaintiff was a "no-show" for an appointment with Dr. Rollins, the ENT specialist, on March 12, 2007. (R. 191).

On May 2, 2007, Dr. Jennifer Wesley, an audiologist at Alabama Department of Rehabilitation Services, performed sound booth testing to evaluate plaintiff's hearing. The plaintiff's responses suggested a minimal to possible mild hearing loss in the right ear and a possible low frequency hearing loss at least in the left ear. However, Dr. Wesley concluded that testing results for the left ear were inconclusive due to plaintiff's consistent movement during the testing. Dr. Wesley recommended that, since plaintiff had became upset and was active throughout the testing that day, he return in six weeks for another assessment; she planned to start with testing of plaintiff's left ear to obtain as much information as possible. (R. 136).

The following week, plaintiff's mother took him back to Dr. Rollins, the ENT specialist, reporting an ongoing ear infection and that a hearing test was abnormal for plaintiff's left ear. Dr. Rollins noted, "Right tympanostomy tube remains in place and functional." While he also observed that the "left tube is no longer present[,]" he found that plaintiff had "[n]ormal hearing left ear per OAE." He recommended that plaintiff return for evaluation in three months. (R. 190).[4]

---

[4] Dr. Richard Whitney, a non-examining physician, determined that plaintiff's hearing impairment was not severe, after reviewing plaintiff's medical record, including Dr. Rollins' notes for the May 10, 2007, visit and the audiology report for May 2, 2007. He wrote, "2 year old with problems with otitis media and PETs as of ENT visit 5/10/07 had tube in right and normal hearing left. Audiology 5/2/07 hearing essentially normal." (R. 194-195).

Two weeks later, on May 23, 2007, plaintiff was evaluated by Missy Kemp at the Audiology Outpatient Clinic at Children's Hospital in Birmingham.  Kemp performed OAE and tympanometry testing, finding "[n]ormal peripheral hearing for the frequency range screened" and "normal middle ear function" in plaintiff's left ear.  (R. 253).  She noted that she was unable to perform OAE testing of plaintiff's right ear "due to inability to obtain seal. This is most likely attributed to patent tube or TM perf." (R. 254).  Later that day, plaintiff was evaluated by a nurse practitioner and by Dr. Jimmy Hill at the ENT clinic.  (R. 252).

On May 31, 2007, plaintiff was evaluated by Dr. Rifat Parawaiz for bumps on his scalp.  His mother reported that he also had itching on his face and arms with a rash. On examination, Dr. Parawaiz noted a skin rash with drainage on plaintiff's scalp and, also, a rash on his body and extremities which "look[ed] like scabies." (R. 386).  Dr. Parawaiz diagnosed scabies and impetigo of the scalp, and prescribed medication.  (R. 387). On June 13, 2007, plaintiff returned to Dr. Parawaiz for follow-up of the impetigo of his scalp; the treatment note indicates that the impetigo had resolved.  (R. 380-383).  Plaintiff's mother also reported that the plaintiff complained of headaches "off and on" but that she was not sure whether plaintiff really had headaches because he does not withdraw from activity. (R. 380).  On June 20, 2007, plaintiff's mother reported to Dr. Parawaiz that plaintiff had headaches  "off and on for a few months," associated with photophobia but with no nausea or vomiting.  Plaintiff's hearing and vision were noted to be "grossly normal."  (R. 378).  Dr. Parawaiz order a CT scan of the head and sinuses; the CT scan was "unremarkable." (R. 377).  Blood testing for lead was within

limits.  (R. 376).

On July 19, 2007, Dr. Hill performed outpatient surgery on plaintiff at Children's Hospital in Birmingham – tube placement in the left ear and cerumen removal in the right ear. (R. 223).  On August 6, 2007, plaintiff's primary care physician, Dr. Ted Williams, referred him to the allergy clinic at Children's Hospital. Under "history," the examining physician noted, "Pt is a 2 yo [with] a [history of] allergy symptoms [and] ear infections who presents for evaluation of exaggerated swelling in response to mosquito bites. [N]o respiratory symptoms. [History of] skin infections requiring [antibiotics]. Mother has tried Benadryl [without] success. Tried bug repellant [without] success."  The doctor ordered blood testing. (R. 206-214). The mosquito allergy test was negative (R. 214) but plaintiff had a low-level allergy to ragweed.  (R. 213-214).

On November 13, 2007, a month after plaintiff's third birthday, plaintiff returned to Dr. Parawaiz for an "ADHD screen."  He had impetigo on his head and also complained of an earache. Dr. Parawaiz diagnosed allergies and ongoing tinea capitis. (R. 374). The following day, plaintiff's mother brought him back to the office, stating that he had a fever the previous evening and right ear pain all night.  Dr. Parawaiz diagnosed right otitis media with drainage, and prescribed eardrops and antibiotics.  (R. 373).  On November 29, 2007, plaintiff returned to the ENT Clinic at Children's Hospital for follow up on his ear surgery. Plaintiff's mother reported the history of otitis media in plaintiff's right ear within the last month but no problems in the left; she denied any further problems. (R. 203-204).

On November 26, 2007, plaintiff returned to Dr. Parawaiz, complaining of headaches and for follow up of his ER visit for otitis.  Plaintiff's mother reported that his headaches were severe and kept plaintiff up all night.  Dr. Parawaiz diagnosed migraines and prescribed Inderol. (R. 372).[5] A few weeks later, plaintiff returned to Dr. Parawaiz for treatment of diarrhea and congestion.  His headaches were reported to be stable on Inderol.  (R. 371).  On December 21, 2007, Dr. Parawaiz admitted plaintiff for rehydration after his mother brought him to the office complaining of "profuse" diarrhea, vomiting at night and decreased appetite. (R. 365-70).

On December 27, 2007, plaintiff reported to Dr. Parawaiz for regular screening. The doctor noted that he was "doing fine" and that his headaches were stable. His mother stated that he had behavior problems and she thought he had ADHD. She requested a referral to psychiatry. Dr. Parawaiz referred plaintiff to psychiatry and to neurology for his migraine headaches. Plaintiff's blood test for lead was within limits and his sickle cell screen was negative. (R. 360-62). Plaintiff returned to Dr. Parawaiz on January 8, 2008, with a complaint of a headache two days previously which was better at the time of the office visit. The doctor diagnosed migraine ("stable") and allergies.  (R. 358).

On January 25, 2008, Dr. Murtuza Kothawala – a neurologist in Dothan – evaluated plaintiff, on referral from Dr. Parawaiz, for his complaints of chronic headache over the previous three to six months.  Plaintiff's mother told Dr. Kothawala that plaintiff complained

---

[5]  Dr. Parawaiz also made a diagnosis related to plaintiff's right ear, but it is illegible. (R. 372).

of headaches two to three times each week, which last from a few hours to the entire day, with nausea and vomiting. She reported that he had behavior problems, and was "mean" and hyperactive and aggressive. She also reported a previous medical history of ADHD and sickle cell traits. (R. 389-91).[6] Dr. Kothawala assessed recurrent headache, possibly migraine headache, and ADHD. His treatment plan included an MRI of the brain and increasing the dosage of Inderol. He asked plaintiff's mother to maintain a headache diary, and to follow up in three weeks. (R. 392). Plaintiff had an EEG on that same day that was reported as normal. (R. 393). Plaintiff returned to Dr. Kothawala on February 14, 2008 for his three-week followup. Dr. Kothawala's treatment note indicates that the EEG was normal and, also, that the MRI was normal. The mother reported that plaintiff had headaches almost every other day until four days previously but no headache since then. Dr. Kothawala assessed headache, continued plaintiff on the Inderol, and scheduled follow-up in one month. (R. 395).

Four weeks later, on March 12, 2008, plaintiff's mother brought him to Dr. Parawaiz, reporting that the "[n]eurologist said [that his] ears were pink and needed to be checked." Dr. Parawaiz diagnosed right otitis media and prescribed an antibiotic. (R. 357). Plaintiff returned to Dr. Kothawala for his one-month follow-up appointment on March 14, 2008. Plaintiff's mother reported one headache every week, with crying but no vomiting. Dr. Kothawala diagnosed headache, ADHD and sleep disorder, continued plaintiff's Inderol, and scheduled plaintiff for follow up in 2 months. (R. 396).

---

[6] Plaintiff's sickle cell blood screen the previous month was negative. (R. 362).

On March 26, 2008, plaintiff returned to Dr. Parawaiz for follow-up of his otitis media. His mother reported dysuria. The doctor diagnosed dysuria, urinary tract infection, and right secreting otitis. Dr. Parawaiz referred plaintiff to ENT and prescribed medication. (R. 355).

On May 8, 2008, plaintiff returned to Dr. Parawaiz with complaints of wheezing for two days. Plaintiff's mother also complained about his ears but that he was due for surgery the following day. Plaintiff was given an albuterol treatment with a mask in the office. The doctor diagnosed acute sinusitis, asthma exacerbation and left otitis media. (R. 354). On June 11, 2008, plaintiff's mother reported that he had been wheezing and coughing in his sleep for 2 days. Dr. Parawaiz diagnosed sinusitis and asthma exacerbation. (R. 353). Plaintiff returned for follow-up two weeks later. Plaintiff's "exercise asthma" was reportedly doing better. (R. 352). On July 15, 2008, plaintiff's mother reported he had a fever the previous evening with shortness of breath and that she gave him an albuterol treatment. He did better but still had a runny nose and coughing. She reported that he had a mild headache. The doctor diagnosed asthma exacerbation, acute sinusitis, and migraine. (R. 351).

On September 5, 2008, Dr. Kothawala evaluated plaintiff on follow-up. Plaintiff's mother reported headaches once or twice each month and stated that plaintiff had a bad headache the previous day. Dr. Kothawala diagnosed recurrent headache and scheduled plaintiff to followup in 2 months. (R. 398). On October 27, 2008, when he was just over four years old, plaintiff returned to Dr. Parawaiz. His mother reported that plaintiff was wheezing after his breathing treatment and asked that the doctor also look at his ears. She further stated

that she needed a prescription for scalp shampoo.  The doctor diagnosed allergic rhinitis.  (R. 350).

On November 6, 2008, plaintiff returned to Dr. Kothawala for followup.  His mother reported no headache, no side effects and that plaintiff was sleeping better.  Dr. Kothawala again assessed headache and scheduled plaintiff for followup. (R. 399).  At the follow-up appointment on December 18, 2008, plaintiff's mother reported two headaches requiring Tylenol, and behavior problems.  Dr. Kothawala diagnosed behavior problem and headache.  (R. 400).

### Treatment for Mental Impairment

On June 1, 2007, plaintiff's mother took him to Ozark Specialty Clinic for an initial psychiatric evaluation.  Plaintiff was then just over two and a half years old. The doctor's notes are almost entirely illegible.  Under past medical history, the doctor notes, "Established as ADHD." (R. 202). Dr. Josue Becerra evaluated the plaintiff on August 28, 2007. Dr. Becerra noted that the mother was given prescriptions two months earlier by Dr. Lopez for Metadate CD and Risperdal liquid. Dr. Becerra noted plaintiff's mother's report that the Metadate "helped for about seven hours/day," and that plaintiff slept "only after taking Risperdal at night." He noted plaintiff's behavior to be normal, his attention span and impulse control to be poor, and his affect to be labile and hypothymic.  For his Axis I diagnosis, Dr. Becerra wrote, "ADHD (???). – (Mother understands this diagnosis cannot be made at this

age.)."[7]  He changed plaintiff's medication to Clonidine and scheduled plaintiff for follow-up in two weeks.  He referred plaintiff's mother to "'Behavior Management'/Parenting skills." (R. 417).  On September 11, 2007, plaintiff's mother reported that he was sleeping better but was too "hyper" and doesn't listen.  For his Axis I diagnosis, Dr. Becerra wrote, "ADHD(?) - Pt. is 2 y/o[.]"  He again added, later, "Mother understands ADHD diagnosis cannot be made at this age[.]"[8]  Dr. Becerra suggested a trial of Focalin XR, which plaintiff's mother "eagerly accept[ed]."  He referred plaintiff for "parenting skills" counseling and scheduled plaintiff for follow-up in a month.  (R. 416).[9]  On October 9, 2007, plaintiff's mother reported, "He's doing very well."  Dr. Becerra diagnosed "ADHD (?) remarkably improved after initial trial [with] Focalin[.]" (R. 415)(emphasis in original).

On November 28, 2007, plaintiff returned to Ozark Specialty Clinic, this time seeing Dr. Tessema. Plaintiff's mother reported that plaintiff was not sleeping and eating well and had been having headaches for two months.  She reported that the Focalin was not working, that his sleep was poor and that he was waking up after three hours.  Dr. Tessema noted that the mother is aware that the Focalin and Clonodine are "not indicated for use [with] ADHD in children [less than] 6 [years old].  (R. 413).  Dr. Tessema diagnosed "ADHD hyperactive

---

[7]  Dr. Becerra apparently added the parenthetical comment at some point after the office visit. (Compare R. 201 and 417).

[8]  This comment, also, was added to the treatment note at some point after the office visit. (Compare R. 200 and R. 416).

[9]  There is no indication in the record that plaintiff's mother followed up on Dr. Becerra's recommendation for parenting skills counseling.

type; ? Insomnia (Primary)."  (Id.).

On January 4, 2008, plaintiff's mother told Dr. Tessema that plaintiff had been diagnosed with "sickle cell trait"[10] and migraine headaches, and that plaintiff was "otherwise doing well except that he bounces off the wall" and has "crying spells." (R. 410). Dr. Tessema diagnosed "?ADHD." (R. 410).  In his evaluation of plaintiff's current mental status he noted that plaintiff's behavior was normal, he was fully alert, and that his attention span was good. He noted that he was "[h]yperactive" and "[f]idgety."  (R. 410).  On January 18, 2008, plaintiff's mother reported to Dr. Tessema that he "[h]ollers and screams." (R. 409). On February 13, 2008 plaintiff's mother reported that plaintiff had stopped hollering and screaming and has better sleep and that he was "[o]verall doing well," except for his complaints of headaches. Dr. Tessema diagnosed ADHD.  (R. 408).

On March 4, 2008, plaintiff's mother reported that he was aggressive when his medications wore off, especially in the afternoon. She further reported that he had been "waking up hollering in the middle of the night" since he had to visit his father once. Dr. Tessema diagnosed ADHD and nightmares.  (R. 407).[11]

On May 12, 2008, plaintiff's mother told Dr. Tessema that plaintiff was still having nightmares since the previous visit, and that plaintiff had awakened, screaming, on two nights

---

[10]  Although plaintiff's mother told both Dr. Kothawala and Dr. Tessema, in January 2008, that plaintiff had been diagnosed with sickle cell trait, his blood screen for sickle cell the previous month was negative.  (R. 362).

[11]  Plaintiff's father was reportedly "in jail for 70 years [without] probation."  (R. 409).

since the previous visit. Plaintiff was reported to be "Very calm and not bouncing off the walls. She reported no hallucinations or headaches." (R. 406). Dr. Tessema did not indicate any diagnoses. (Id.). On July 22, 2008, Dr. Tessema saw plaintiff after he had a visual hallucination, which had stopped by the time plaintiff arrived at the emergency room. Plaintiff's mother reported that he was "bouncing off the wall, breaking things," and that he "was to start Pre K." (R. 405). Under "Current Medications and Issues," Dr. Tessema wrote, "None." Dr. Tessema diagnosed "ADHD." (Id.).

On October 31, 2008, just after plaintiff's fourth birthday, plaintiff's mother reported that he was involved in a car accident and was "very aggressive" after the accident. She indicated that he had nightmares "2X/[illegible]." Dr. Tessema diagnosed ADHD and nightmares. (R. 404).

On November 21, 2008, plaintiff's mother told Dr. Tessema that plaintiff "[t]alks about shooting people and that he was not sleeping well on his current dosage of Elavil. Dr. Tessema diagnosed ADHD and changed plaintiff's medications, adding Risperdal and increasing his dosage of Elavil. (R. 403). On December 19, 2008, plaintiff's mother reported that plaintiff's sleep was better, but plaintiff still woke up during the night. Dr. Tessema noted, "Overall OK," and no nightmares. Dr. Tessema diagnosed ADHD and migraines. (R. 402). Dr. Tessema noted plaintiff to be "calmer" with good attention span and normal behavior. (R. 402).

**Administrative Proceedings**

19

On May 2, 2007, plaintiff's mother filed an application for Supplemental Security Income benefits on plaintiff's behalf, alleging that he became disabled on May 1, 2006 due to a "[h]earing problem in [his] left ear." (R. 84-88, 102). Plaintiff's application was denied initially on June 29, 2007. (R. 65-69). On August 15, 2007, plaintiff's mother requested a hearing before an administrative law judge. (R. 70). In a disability report she completed for purposes of her appeal, plaintiff's mother indicated that plaintiff's condition had changed for the worse on approximately August 12, 2007, and that he "fights, bites and has temper tantrums" and "[n]o daycares will accept him." (R. 129). She stated, "He has been officially diagnosed with ADHD and bipolar disorder[,]" with an approximate beginning date of July 1, 2007. (Id.). She indicates that plaintiff had his first visit with Dr. Fernando Lopez in June 2007 and the most recent visit on July 18, 2007. The reason she gave for the office visit was "ADHD and bipolar disorder." (R. 130). Plaintiff's mother further noted that he went to Children's Hospital in Birmingham on August 6, 2005, due to an allergy to mosquitoes. (R. 130). She wrote, "He has fits and starts throwing stuff at you. I am having trouble with him now because he is out of his medicine." (R. 132).

The ALJ conducted an administrative hearing on January 23, 2009. (R. 33-44). At the hearing, the ALJ admitted Exhibits 1-A, 1-B through 7-B, 1-D through 2-D, 1-E through 8-E and 1-F through 12-F. (R. 37).[12] Exhibits 13F (medical records from Southeast Neurology)

---

[12] Exhibit 9-E is a February 2, 2009 letter from plaintiff's counsel, Barbara Wade, to the ALJ stating that no further records would be forthcoming and that the record could be closed. (R. 135). Wade's letter references plaintiff's record from Trinity Daycare, stating that it was "submitted" on January 30, 2009. (R. 135). However, this document is not included in the administrative transcript.

and 14F (psychiatric treatment records from Ozark Specialty Services) were provided to the ALJ and added to the record after the hearing.

At the time of the hearing, plaintiff was four years old. (R. 37). Plaintiff's mother testified that he has ADHD and he is bipolar and has asthma and allergies. She stated that he's been kicked out of 3 daycare centers. She states that she tried putting him in school but he was kicked out of school and they told her to try back after she found some medication that would control his attitude and temper problems. (R. 38). The mother testified that the daycares told her that he was fighting and hitting other kids and pulling their hair, and that when he started at the little Head Start Preschool, he hit a little boy and made his nose bleed. Plaintiff's mother testified that she had not witnessed any of those temper problems in the home setting. (R 38-39). She testified that when she tells him to do something he'll fuss about it or whine about it and throw a fit, start kicking his feet and hitting the wall. She testified that the doctor said that he is bipolar. She stated that his condition had stayed about the same over the last year and that she had not noticed any improvement or deterioration. (R. 39). She testified that he will not sit still to read a book on her lap and won't finish a puzzle. He can watch television for about twenty to thirty minutes. He has cousins and he fights with them. Even when he uses his medication, his asthma is not under control. When runs, he coughs and wheezes. (R. 40-41). Plaintiff's mother testified that his hearing goes and comes. Sometimes

---

A different attorney – retained by plaintiff at the Appeals Council stage of this case – requested copies of the exhibits from the Appeals Council (R. 3). However, plaintiff did not provide the referenced daycare record to the Appeals Council or to this court. Accordingly, it is not a part of the record before this court.

he can hear out of his left ear and sometimes he cannot.  She stated that he still has ear

infections and they are still doing hearing tests on him to make sure his hearing is staying the

way its supposed to be and not going in and out.  She testified that Annie Walker is her

stepmother. (R. 41).[13]  Plaintiff's counsel declined to question her at the hearing. (R. 41).  The

ALJ suggested to counsel that it might be helpful if any of the daycare people who had seen

the plaintiff for some period of time could write an "informal third-party statement" and if

plaintiff could request a summary from Dr. Tessema.  (R. 42).  The ALJ kept the record open

to receive the additional evidence and also advised plaintiff's counsel to ask for more time if

she needed it. (R. 42).

The ALJ issued a decision on March 30, 2009. (R. 15-32).  She concluded that plaintiff

was an older infant on May 2, 2007, the date the application was filed, and that, at the time

of the decision, he was a preschooler.  She found that he has a severe impairment of Attention

Deficit Hyperactivity Disorder. The ALJ discussed the plaintiff's history of chronic otitis

media and his surgery to have tubes placed into both ears to treat the otitis media.  (R. 18).

She found, however, that the record failed to support the plaintiff's contention that his ear

impairments caused severe functional limitations.  She stated "the allegations of continued

auditory deficits in the left ear are not supported by the evidence to present any more than

minimal limitations to the plaintiff's abilities." (R. 18). The ALJ noted that while plaintiff

was diagnosed with asthma, there are "notably few indications of the functional limitations

---

[13]  Walker completed a function report regarding the plaintiff that was in the record before
the ALJ.  (Exhibit 5E, pp. 110-16).

caused by this condition." (R. 18)(citing Exhibit 12-F). The ALJ found that, while the claimant's asthma and allergies are medically determinable impairments, they are effectively treated with medication, and the residual symptoms do not cause more than minimal limitations in the plaintiff's functional abilities. She concluded, therefore, that the asthma and allergies were not severe impairments. (R. 19). The ALJ noted that, while claimant's mother has alleged that he suffers from bipolar disorder, the treatment records do not reflect any such diagnosis. She stated, "However, considering the medications the claimant has been prescribed the symptoms of this condition were considered in connection with the claimant's severe impairment of ADHD." (R. 19). The ALJ further noted that plaintiff's condition of tinea capitis is a medically determinable impairment but that it did not impose any significant functional limitations. She observed that the condition was effectively addressed with medication and was resolved. Therefore, she concluded that plaintiff's tinea capitis was not a severe impairment. (R. 19).

The ALJ evaluated claimant's ADHD under Listing 112.11 and the plaintiff's hearing deficit under Listing 102.08, considering plaintiff's limitations both as an older infant/toddler and as a preschooler. (R. 19–20). The ALJ concluded that the plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. (R. 19-21).

The ALJ next turned to consideration of whether plaintiff's impairments or combination of impairments functionally equal(s) a listed impairment. (R. 21-31). The ALJ

determined that the plaintiff has no limitation in acquiring and using information. (R25-26). She found that he has a "less than marked" limitation in attending and completing tasks. (R. 27). She concluded that he has a "marked" limitation in interacting and relating with others. (R. 28). She further concluded that the plaintiff had "less than marked" limitations in moving about and manipulating objects. (R. 29). She further found that the plaintiff has a "less than marked" limitation in the ability to care for himself and in health and physical well-being. (R. 30-31). Accordingly, the ALJ concluded that the claimant has not been disabled as defined in the Social Security Act since May 2, 2007, the date the application was filed. (R. 31-32). On September 25, 2009, the Appeals Council denied plaintiff's request for review. (R. 5-7). Plaintiff commenced the present action, seeking review of the Commissioner's decision, on December 23, 2009. (Doc. # 1).[14]

### Plaintiff's Contentions

Plaintiff contends that the ALJ committed reversible error by failing to find a "marked" limitation in the domain of "Attending and Completing Tasks" and by failing to find an "extreme" limitation in the domain of "Interacting and Relating with Others." (Doc. # 15, pp. 8-11).[15] With regard to the domain of "Attending and Completing Tasks," the ALJ stated:

---

[14] The Appeals Council granted plaintiff's request for additional time to file a civil action seeking review of the Commissioner's decision. (R. 1).

[15] The Commissioner defines a "marked" limitation as one that:

[i]nterferes seriously with your ability to independently initiate, sustain, or complete activity. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effect

The claimant's condition of ADHD has caused significant limitations in the area of attending and the ability to maintain concentration. Unable to attend to one activity for a significant period of time, the claimant was able to watch television for 20-30 minutes. The claimant further has become disruptive in being unable to attend and complete tasks, and objective records have noted his ADHD was of the hyperactive type. However, treatment record[s] note the claimant's medications have been effective in the past, though statements to the contrary were made in testimony. The claimant's mother has noted medications have managed to slow him down a bit. The claimant's inability to sustain attention enough to be read to by his mother and inability to feed himself supports his limitations. However, his lack of cooperating in getting dressed indicates the claimant is sometimes able to attend for the requisite period to complete tasks. While the claimant is unable to sit still and has significant difficulties in maintaining concentration, the record indicates prescription medications are able to attenuate some of these limitations.

(R. 27).[16] Plaintiff contends that the ALJ's stated reasons are not supported by evidence of

record. Plaintiff observes that while, on October 9, 2007, claimant's symptoms were

"remarkably improved after initial trial" of medication, he was noted to be at least moderately

hyperactive and fidgety in subsequent records, with poor attention span on at least one

---

of your impairment(s) limits several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. 416.926a(e)(2)(i). For children who have not yet attained the age of three, the Commissioner's regulation provides that the Commissioner will find that the claimant has a "marked" limitation if he is "functioning at a level that is more than one-half but not more than two-thirds of his chronological age[.]" 20 C.F.R. 416.92a(e)(2)(ii). An "extreme" limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities," and is "'more than marked.'" 20 C.F.R. 416.92a(e)(3).

[16] The Commissioner's regulations set forth examples of functions that children should be able to perform, depending on their ages, as to each of the domains. See, e.g., 20 C.F.R. § 416.926a(h)(attending and completing tasks) and § 416.926a(i)(interacting and relating with others). The ALJ considered these examples in her analysis of plaintiff's functioning in these two domains. (R. 27-28).

occasion.  Plaintiff states "these clinical findings are consistent throughout the period after the ALJ stated that medication had essentially stopped his impairment."  (Doc. # 15, p. 9). However, this misstates the record. First, the ALJ did not conclude that "medication had essentially stopped [plaintiff's] impairment" on October 9, 2007.  Rather, she noted – correctly – that the treatment records "reflect continued diagnoses and treatment for ADHD and medications prescribed, but contain little narrative regarding the claimant's condition," and she found that plaintiff has a severe impairment of ADHD (R. 18, 24).

Additionally, contrary to plaintiff's representation, the cited negative clinical findings do not consistently appear in the treatment records after October 9, 2007. Plaintiff's psychiatric treatment notes reveal that he was evaluated fourteen times by either Dr. Becerra or Dr. Tessema over an eighteen month period beginning June 1, 2007, and ending December 18, 2008.  (Exhibit 14F, R. 402-418).  During those fourteen office visits, the psychiatrist made specific note of plaintiff's attention span on eight occasions.  Plaintiff's attention span was noted to be poor on three of those occasions: August 28, 2007; September 11, 2007; and November 28, 2007.  His attention span was noted to be fair on October 9, 2007. These observations occurred during plaintiff's first four office visits following his initial evaluation. (R. 413, 415, 416, 417).  In all of plaintiff's visits for the remainder of the eighteen month period of treatment, his attention span was either not specifically noted or it was observed to be "Good."  Plaintiff's physician noted his attention span to be "Good" on January 4, April 4, May 12 and December 18, 2008.  (R. 402, 406, 407, 410).  In the category of psychomotor

activity, plaintiff was observed to be hyperactive once, fidgety once, and both hyperactive and fidgety on five occasions.  On two occasions, he was observed to be "calmer" and in the remaining office visits there was no notation made in that category.  (R. 402-406, 409, 410, 413 and 416).

Plaintiff also points to the ALJ's statement that the plaintiff's refusal to cooperate in getting dressed "indicates the claimant is sometimes able to attend for the requisite period to complete tasks." (Doc. # 15, p. 9)(citing R. 27).   Plaintiff argues that his lack of cooperation in getting dressed does not detract from his mother's hearing testimony but, rather, supports a finding of a "marked" limitation in this domain. (Doc. # 15, pp. 9-10).  However, in the functional report that she completed, plaintiff's grandmother explained that "he does not cooperate[] with getting dress[ed] *because he wants to get dress[ed] all by himself*[.]"  (R. 115)(emphasis added).  She also indicated that plaintiff is able to follow two-step directions (R. 113)[17] and, as the ALJ noted, plaintiff's mother testified that plaintiff can watch television for twenty to thirty minutes. (R. 40). Thus, the ALJ's conclusion that plaintiff has a "less than marked" limitation in the domain of "Attending and Completing Tasks" is supported by substantial evidence.

Plaintiff further contends that the ALJ committed reversible error by failing to find that he has an "extreme" limitation in the domain of "Interacting and Relating with Others." (Doc. # 15, pp. 10-11).  Plaintiff argues that his treatment records demonstrate that he had

---

[17]  Interestingly, Plaintiff's grandmother indicated that plaintiff does not follow one-step directions, stating that "you keep having to tell him over and over again."  (R. 113).

substantial difficulty in getting along with others even while on significant dosages of medication for his ADHD. (Id., p. 11). The ALJ noted the testimony of plaintiff's mother that plaintiff had been removed from three daycares for fighting, temper tantrums and moodswings. (R. 28). She further noted plaintiff's mother's testimony that plaintiff gets into fights with his cousins and that he "jumped on a girl that lived next door." The ALJ concluded that plaintiff had significant difficulties in social functioning and "marked" limitations in this domain. (R. 28). The court notes that when the ALJ first asked plaintiff's mother whether she had seen any of those temper problems in the home setting, she initially responded, "No." (R. 38-39). On further questioning from the ALJ about whether she had "behavior issues with him in any way," plaintiff's mother responded that, when she tells him to do something, "he fusses about it or he whines about it and he throws a fit, starts kicking his feet, hitting the walls." (R. 39). In the functional report they completed, both plaintiff's mother and his grandmother indicated that plaintiff is affectionate towards his parents. (R. 96, 115). Additionally, during office visits with his psychiatrist, plaintiff was noted to be aggressive and hostile only once, on September 11, 2007. (R. 416). On every other occasion on which the psychiatrist made an indication in the "Behavior" category, the psychiatrist indicated that plaintiff's behavior was "Normal." (R. 402, 403, 406, 407, 410, 413, 415, 417). Thus, the ALJ's finding that the claimant has a "marked" limitation – as opposed to an "extreme" limitation – in the domain of "Interacting and Relating with Others" is supported by substantial evidence.

## CONCLUSION

Upon consideration of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law and, accordingly, that it is due to be affirmed.  A separate judgment will be entered.

DONE, this 13th day of June, 2011.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE